I may please the court, counsel for the record, Eric Magnuson on behalf of Cuker Interactive. The district court invaded the province of the jury when it substituted its judgment for that of the jury on whether my client had shown that it had trade secrets. It also intruded upon the jury's judgment when it substituted its view of the evidence on the question of causation and damages. Those two acts by the district court were error, and we ask that you reverse and remand to the district court with instructions to reinstate the original judgment and to conduct further proceedings consistent with that decision. I want to talk first about the trade secret identification. The jury heard evidence that from the very beginning of this relationship, in fact preceding this relationship, it was Walmart's plan to get the know-how to build the product. Not get the product itself, not get just an interactive responsive webpage, but to get the information so that it could train itself and its vendors to do the work that they were to do. What evidence establishes that? In the very first meeting that Aaron Cuker had with the representative from Walmart, the Walmart representative said, we want to hire you to upscale, that's his phrase, that's in the transcript, upscale our people to teach them how to do responsive design. And Aaron Cuker said, I immediately said, we don't do that. You're hiring us to build you a product. We'll do that. But we won't train you with our techniques and our technology on how we build the product. Because that's our business. But what did Mr. Cuker do and the company do to let Walmart know what was a trade secret? What things that Cuker had that were not going to be disclosed and should not be disclosed if Walmart knew? First of all, the district court's decision wasn't that these weren't trade secrets. It was that they weren't adequately protected. The adequate protection was, you know, they didn't say, trade secret coming. But the evidence showed that when Walmart said, we want your source files, we want the software that tells us how to do this, that's the demand, the source files. Cuker consistently said, no, we don't produce the source files. And at that point in time, the jury heard the evidence that Walmart said, we're not going to pay you. They started withholding payments. And they ultimately said, don't mess with us or we'll destroy you. Give us that stuff. Now ultimately in the April 8th code drop, the source files were included. And after that, Walmart, which knew that it had gotten what it had been demanding, relented and started making payments. You don't have to, under the law, have a stamp on something that says trade secret. You look at all the facts and circumstances. What the Arkansas Trade Secret Act and the decisions of the Arkansas appellate courts say it is a fact-intensive process to determine whether a trade secret exists and whether it's been adequately protected. Remember the context. When you provided that material, you sort of acquiesced in a change in the contract that you had, didn't you? You know, Your Honor, the contract didn't call for us to provide them with our trade secrets. It was very clear. The deliverables were wireframes, these templates. But they asked for them and you said no. And we said no and we said no and we said no. And they said we'll destroy you and we won't pay you. And yes, we acquiesced. So after, you know, I understand that there's this argument of duress, but the source code was at that point surrendered. My question is, what were the accompanying facts that were, in this year, sufficient to put Walmart on notice that these were in fact trade secrets, that the source code was trade secrets? And I understand that your argument is that that's a jury question anyhow and the jury made its decision and that should stand. But we know that the district judge felt that there was, as a matter of law, insufficient evidence from which the trade secret analysis could have been understood by Walmart. Right. And I was about to answer Judge Beam's question by saying you have to look at the context. The context was this.  It was demanding the know-how. It was demanding the tools to do this. Sucre said we don't provide that. Walmart said we want it. We're going to get it from you. Okay. So that identifies the trade secret. Walmart knew that it was confidential. They knew it was confidential because they couldn't get it. They knew that anything that my client transmitted was transmitted securely to, you know, through this software that kept it confidential. They knew that their contract, and this is, you know, it's on the second page. It's towards the bottom. It said anything we give you is confidential whether it's identified as confidential at the time we disclose it or not. Walmart knew that it had value. Why did it know it had value? Because it wanted it. It wanted to use that value to enhance its own position. And so, Your Honor, I agree. There is no statement from my client that these are trade secrets. What my client said was, this is proprietary. We don't teach people how to do the work that we do. We don't give you the tools that we've developed over the years that let us give you the product. It's like saying, you know, you order a dozen chocolate. There were all sorts of analogies at trial, and I'm trying to figure out whether I could come up with a better one. It's like ordering a dozen chocolate chip cookies, and they're the best chocolate chip cookies. But then it's turning and saying, I want the recipe. And the baker says, I don't give that recipe out, or the formula for Coca-Cola, or the plans for a nuclear reactor. I'll give you the cookies. I'll give you the Coke. I'll give you, you know, the analogy our expert used was the plans for building the deck. I won't give you those. I'll give you the deck, but I won't give you the plans. And so the circumstances here that the jury heard were that Walmart knew it didn't have and couldn't get the tools to make the product that they were demanding. So what did Suker do to protect the trade secret? It said, we won't give them to you. Anything beyond saying, we won't give them to you? Because ultimately they did. Ultimately they were coerced into it. But that's not what the judge decided the issue on. He said that you didn't take adequate steps to identify them as trade secrets at the time you gave them over. You didn't protect them adequately. There was nothing more my client could have done other than risk the ruination of its business. Walmart said, we'll destroy you. Walmart had a thermonuclear approach. So we don't know what all that's going to mean or what that could mean or what that threat might entail. But in terms of if someone holds a gun to your head, that's pretty serious. In arm's length negotiations between commercial entities and you've got a big one telling a little one, give me what I want, that's a little different scenario. There are legal remedies. You don't have to turn over your trade secrets just because the bully said do it. So my question still comes, what did they do? What did Suker do to protect the trade secret other than say no? Because at some point they said yes. When they gave the trade secret, they did so in the context of the protections that existed in the development contract. The protections in the development contract, and I'm sorry that I can't give you the exact page, but if you look, it says Walmart has a license to use the products that my client gives, but has no right to pass them on to anyone else if they're not necessary to use what my client provided. And so when it finally did relent, my client at least thought it had the assurance that they won't go any farther than Walmart, that they won't be given without our permission because the contract said without our permission you can't give them to third parties, that they wouldn't be given to third parties, which the jury concluded they were. They were given to these other vendors, these other writers of web pages who were not skilled in responsive web design, Wipro. Walmart's own witnesses said we didn't go to Wipro because they didn't have the ability to do this. And that launched the whole plan to get from my client the expertise to do it, the tools that they then passed on to Wipro. And so... Why didn't you walk away rather than surrendering them? Because it would have ruined our business at that point in time, Your Honor. There was no question in Judge Brooks' mind or in the jury's mind that we really didn't have a choice. You know, we thought we were entering into a collaborative working agreement with Walmart, and the minute that we had the contract with them, and even before, they said we're going to extract, we're going to wring everything out of Sucre that we possibly can. The demand for the out-of-scope work, you know, you have to keep in mind, this was the first step in turning the English grocery store web page responsive. And if our client did this, there was going to be millions of dollars more work. And what Walmart did was it took the initial product that we did, and the tools once it had extracted them from us, and then turned to another developer that cost way less. Now that's the story that we told, and that's the story the jury believed. And Judge Brooks didn't have any problem with the idea. He didn't touch the finding that the misappropriation here was willful and malicious. And it was the result of coercion. And Arkansas law clearly recognizes that even if you have a contract, you can be coerced into doing something outside the contract more than the contract in particular circumstances. And that clearly was what happened. So why is Judge Brooks wrong in saying you should have identified what was secret? Because we didn't need to do anything more than we did. Walmart knew what was secret. Walmart said we want the source code. We want the tools on how to do this. That's the identification. What's your best authority for the proposition? The best authority, if you look at the cases in Arkansas, first of all, there's the Arkansas Trade Secret Act, which does not include a specific identification at the time of disclosure requirement. Gibraltar Lubricating Services, Cardinal Freight, and Sephora are all somewhat parallel in that there was a disclosure, a misappropriation of processes and compilations of things that weren't readily available. Remember, Walmart couldn't get this because my client kept it secure. They had to get it from my client because it was protected otherwise. Walmart was told we don't give this out. This is our game plan, our playbook. This is how we do it. And, Your Honor, that's a fact question. What Arkansas law does say is the existence of a trade secret is a fact-intensive question. It is, that's the Gibraltar Lubricating Services case. Whether reasonable efforts were made to protect and identify is a fact question. Cardinal Freight carriers, I think there's plenty of authority for that proposition. And you think that you were reasonable or you took the reasonable course that should be... Absolutely, Your Honor. Because not only did we say no, no, no, no, and when we didn't have a choice, we finally said, well, okay. But we did it in the context of a contract that nonetheless prohibited Walmart from doing what we learned later they actually did, which is turn it over to somebody else to use and ace us out of the work that we were going to do to continue the development and to develop the Walmart to go. I don't have the jury instructions or the jury verdict form in front of me. But was this jury adequately instructed on the issue of the protection of trade secrets? So let's say that the jury could rationally have found that these were, in fact, trade secrets, that Walmart was aware that they were, that evidence is out there. The question is, were they instructed sufficiently in that such that it would be sustainable? Absolutely, Your Honor. They were told the elements under the Arkansas Trade Secret Act of what you have to prove. And so it was incumbent on my client to convince the jury that there were trade secrets, that they were adequately identified and that they were kept. And remember, adequate identification in this case is almost unnecessary because what were the trade secrets? It was the know-how that Walmart was demanding. And it was not paying until it got it. And when it finally got it, it relented and it made some of the payments. But it still kept making unreasonable demands. I want to take a little bit of the time that I have remaining and talk about what Judge Brooks did with regard to the damages. He said, well, there was one trade secret that you did adequately identify. It's the Adobe source files. Now, those are a compilation based on years of putting things together, a library of how the webpage design parts work with each other. So that if I'm making a webpage and I have to change something over here, there's a technique and a flow-through on how it impacts everything else. There really wasn't any question, even in Judge Brooks' mind, that that kind of compilation, which the Arkansas Trade Secret Act says is subject to trade secret treatment, was a trade secret. But what he said was, you know, there were two claims for unjust enrichment here. That by getting the trade secrets, Walmart sped up the development of the final British grocery store webpage and the new Walmart to grow page. And saved money because they got to the result faster at using my client's proprietary trade secrets. But they also saved money because they paid less by hiring unskilled programmers, programmers who didn't have responsive web design skills, and upscaled them, what Walmart's planned from the very beginning. And so what Judge Brooks said was that there was insufficient evidence to show exactly what the Wipro, this Indian company that took the secrets and finished a lot of the design. And remember, this is a company that Walmart itself said didn't have the ability to do responsive web design initially. And it had the ability suddenly after it got my client's trade secrets. As you said, in Wyeth versus Natural Biologics, you know, the evidence that trade secrets are actually used can be inferred from the fact that there's a sudden appearance of a similar product in an unexplained way shortly after the misappropriation of the trade secrets. That's exactly what happened here. And what Judge Brooks said was, I'm not going to give you the saved costs from the responsive web design because you can't tell me exactly what Wipro did with the trade secrets. You can't show me mathematically that programmer X turned to file B and used it to create file C. With respect, that is too high a burden under Arkansas law. There is no proof requirement that we show proximate cause in the tort sense. All it has to be is fairly traceable. And it was traceable here because Chuck Easton, our computer expert, explained in detail to the jury what the trade secrets were and how they saved an unskilled programmer time and effort. And there was no objection to Mr. Easton's testimony about the exact savings, the exact benefit. Then Dr. Kennedy took that and he analyzed all the invoices, for example, that Wipro produced for its responsive web design. He actually looked and saw who were the responsive web designers at Wipro. Remember the people who didn't have the skill to do it to start with? And he said, well, this is how much they spent on responsive web design and that is a saved benefit as well. So they got out early and they got out cheaper. And Judge Brooks said, I'll let the jury verdict stand on the English grocery store site that they got out early. That's the 300 and some odd thousand dollars. But I'm going to take a million nine off this particular trade secret because you didn't show me which programmer did what. That's not the law. There is a relaxed standard of causation in trade secret in unjust enrichment cases because it is largely an equitable remedy. I think, Judge Beam, that you wrote an opinion on that point. I know you wrote an opinion in the case that I'm talking about, but I don't have it at hand. And finally, he said, with regard to the Walmart to-go shop, there's no evidence that Cloud Four ever got this stuff. Well, with respect, members of the court, that's a selective reading of the evidence. Certainly the Cloud Four representative got up and said, nope, we never got it. We didn't use it, et cetera. If you look at page 107 of the appendix, it's part of a Walmart PowerPoint presentation when they're doing the Walmart to-go with Cloud Four. And it says, here's the latest from Sucre. Our plan is to leverage Sucre's assets or its work into what we're doing for Walmart to-go. I mean, that alone creates a fat question for the jury to resolve. I'm into my rebuttal time, members of the court, so I want to leave you with this. On our appeal, I think that the standard for judgment as a matter of law is an extremely high one, as we all know. With respect, I think Judge Brooks substituted his judgment for that of the jury on whether my client adequately protected its trade secrets and whether you could trace from the misappropriation the unjust enrichment that Walmart received. You should reverse. You should remand for further proceedings consistent with that reversal, which would include a reconsideration of the attorney's fee award. Thank you. I save the rest of my time for rebuttal. Thank you, Mr. Magnuson. Mr. Greenstein. May it please the court, my name is Joe Greenstein. I represent the appellee and the cross-appellant in this case, Walmart. Your Honors, this litigation arose from a contract by which Sucre agreed to provide certain website development services to Walmart. And that particular contract went out of its way to bar any potential trade secret claims from coming from Sucre. Nevertheless, the district court allowed Sucre to generate four trade secrets and take them to trial. That contract required Sucre to make specific deliveries to Walmart and to use its best possible efforts to meet a specific timeline. And yet the district court allowed Sucre to pursue a claim for nonpayment, even though it didn't make those deliveries and it didn't meet that timeline. And that contract had a specifically defined scope and required any changes in that scope to be made in writing. And yet the district court allowed Sucre to pursue an unjust enrichment claim over extra-contractual, unwritten performance. So by this appeal and by this cross-appeal, all that Walmart is asking is for this court to return the parties back to the contract and take them back to what they agreed to. Now, there are several issues with respect to this. What is the remedy you're seeking before this court? We are asking this court to affirm the dismissal of the three trade secrets that Judge Brooks did and to reverse Judge Brooks' judgment as to the fourth trade secret, as to the breach of contract claim, and as to the unjust enrichment claim, and remand accordingly. There are several different issues at issue in this appeal, the trade secrets, the contract claim, and the unjust enrichment claim. Let me talk first about the trade secrets claims. There are three separate problems with those claims, each of which independently warrants dismissal of all four of the trade secrets. Those are the fact that the trade secrets were contractually licensed to Walmart, that Sucre failed to identify them at the time of their disclosure, and that they were insufficiently described with particularity. Well, how can you know they were assigned to Walmart if they're not identified? Well, that's the nice thing about the assignment argument, Your Honor. That comes from Section 3C of the contract. You don't have to get into the specifics about what the trade secrets were. You don't have to consider whether or not they were sufficiently specific. You don't have to consider the technology, none of that, because the facts are undisputed as to that assignment. The assignment under Section 3C of the contract only requires that Sucre make those trade secrets, include those trade secrets with its deliverables. Which trade secrets? You're saying they're not identified, but you're saying the trade secrets. So they're identified somewhere. Well, my position, Your Honor, is whatever the trade secrets are, Sucre itself admits that this undifferentiated, massive legal claim, whatever it is, was provided to Walmart with the deliverables. So my point is you do not need to confront what the trade secrets are. It doesn't matter because Sucre admits that simple factual predicate, which is everyone agrees that the deliverables under the contract were these things called code drops. What jobs? They're called code drops. That's the terminology used in the industry where you've created some computer code and you drop it on who you're delivering it to. And that's the terminology everyone used. There's no dispute those are the deliverables. There is also no dispute that the things that Sucre claims as trade secrets, which we disagree are trade secrets. There is no dispute that when Sucre provided the deliverables, it also provided these things it claims are trade secrets. And under Section 3C of the contract, 3C1 specifically, the contract provides that if Sucre makes its intellectual property part of the deliverables, which it admits it did, Walmart has a license to that intellectual property. It's as simple as that. Sucre's only response to that argument, their only response is to mischaracterize what 3C says and then attack a straw man. Sucre's argument as to 3C is that 3C only covers things that are deliverables. Walmart only receives a license if something is a deliverable. And these trade secret things, they were not deliverables. They were included with the deliverables, but they weren't deliverables. But that argument is not consistent with the language of the contract. They were a prize in the Cracker Jack box. In other words, you bought the Cracker Jacks and you got the prize of the secret. They provided it along with the Cracker Jacks. That's correct, Your Honor. Because Section 3A of the contract already gives us all right and title to the Cracker Jacks. We have all right and title to the deliverables under Section 3A. So it doesn't make any sense for Sucre to read Section 3C to mean we only get a license if something is a deliverable. That doesn't make any sense because under Section 3A we already own all the deliverables. We don't need a license. That's why Section 3C does something different. That's why Section 3C says we know you own all the deliverables, but if Sucre includes with the deliverables something that's not a deliverable, the prize in the Cracker Jack box, Wal-Mart owns that prize. Wal-Mart at least is licensed to it with respect to intellectual property. And there really is no dispute about the facts here. That's what Sucre did. By including these trade secrets, whatever they may be, which it admits it did, in the deliverables, Wal-Mart receives a 3C license. Sucre really has no response to that other than to say 3C doesn't mean what it says. So that's the first argument with respect to the trade secrets. And if you agree with that argument and agree with our reading of Section 3C, which I think is the only sensible reading of it, all the other trade secret issues go away. We don't need to argue about identification. We don't need to argue about whether these things were articulated with particularity. We don't need to argue about use. It's completely licensed. End of story. Let's do talk about the identification requirement, though. I think that's what this Court spent most of its time on. Before we leave here, what I hear you saying is that given the broad definition of intellectual property in 3D, which basically covers anything that anybody ever saw anywhere, patents, trademarks, fell off a tree, I don't know what it is. If you can read that in comparison with 3C and the language that says at the very end of 3C that you have the right to authorize others to do anything that Wal-Mart has authorized you, you say that that ends all the arguments in this case in its entirety. 3C license is broad. Under 3C, if there's intellectual property that's covered by that, we can basically do with it as we please. Right. And you'd be pointing directly to the very last sentence, which says that, because that's where the rubber hits the road here. I mean, if it's sitting inside Wal-Mart, you know, you do whatever you do with it. They have the source code. Okay, fine. The claim here really is you get the source code and you move it into the hands of some third party, who then uses it to its advantage, right? And you're saying that basically because you have the right to use it any way you want and authorize others to use it, that you can do that, right? Correct. Now, does that mean that the people that you give it to have the right to do whatever they want with it, to appropriate it to their own purposes or use, or are they limited to using it only for Wal-Mart's purposes? I wouldn't want to argue that if we gave it to Wipro, Wipro could go out and start, you know, separate website development services and competing with Sucre. There's absolutely no evidence that that occurred. I mean, there's zero evidence in the record that Wipro did anything with these trade secrets. But if we even, you know, credit what the assertions are, there's certainly the only evidence is that they worked on the Wal-Mart project. So I wouldn't want to take that that far. But I think Your Honor raises a good point, which is consider this contract. I mean, counsel, in arguing about the identification requirement, repeatedly stated that this contract had a confidentiality clause and that provided Sucre broad protections. That's not looking at the rest of the contract. If anything, this contract was an overwhelmingly anti-trade secret claim contract. Why do I say that? In Section 3A, Wal-Mart gets all right and title to all deliverables. That would include intellectual property rights. In Section 3B, if Wal-Mart and Sucre get together and develop some intellectual property, all belongs to Wal-Mart. In Section 3C, the first paragraph, the first sentence, Sucre warrants, hey, we're not going to include any of our intellectual property with your deliverables. In Section 3C.1 and 3C.2, the contract says, but by the way, if Sucre does do that, in violation of its warranty, Wal-Mart's licensed. And then in Section 7, Sucre warrants to us that nothing it's delivering to us is going to violate any intellectual property rights of anyone, including Sucre's. So you put all of that together, this contract did everything imaginable to stop the very claims that were asserted against Wal-Mart in this case. It's not like a confidentiality agreement, which you probably have seen in other contexts, where two parties start talking to each other and there's some agreement that says anything that's said between the parties is confidential and can't be used for any purposes. That's not this contract. This contract gives basically every conceivable out from a trade secret claim. Were all those rights in the original contract or were they added later when Wal-Mart put pressure on them? They were in the original contract. It was going to be disastrous for them. They were all in the original contract, Your Honor. There was no negotiation over it. Wal-Mart submitted the contract. Sucre signed it. That was before the pressure, the alleged pressure started. That was back in January of 2014. Do I understand your argument to be, or am I reading too much into it, that if you look at 4A and you look at 3C, and if you look at sort of the broad language of confidentiality in 4A, which is, of course, what Sucre wants us to focus in on. They're saying, listen, there's lots of stuff in here that talks about protecting the confidential information that you receive from us, not doing anything with it, and that this license, whatever it may be, extends for only three years, and that's there. And then you've got the provision of 3A, which is equally broad, and, you know, says that what you deliver to us, and then the question is that we have this fight over deliverables. And it seems to me that there's a world of difference between what you believe a deliverable is and what Sucre believes a deliverable is. And then 7, that ultimate warranty thing. And are you basically saying that if there is any ambiguity or tension that exists between 3C and 4A, that 7 actually is really where the rubber hits the road for your argument, because it says here's the warranty. And in that warranty, we're basically saying you're not giving us any trade secrets. 7 is certainly helpful with respect to that. Did I miss it? We think there's so many provisions of the contract, it's hard to pick a favorite one. Section 7, I think, is very powerful. Or is it 9? I think it's Section 7. It's 8 and 9? Yeah. Because you've got the indemnification, you've got the limited liability. You sit there in 7, 8, and 9, those provisions. But somewhere you're saying that that sort of says, hey, there really is no such thing as secrets. And so then that gets to my question. What's the whole deal about 4A and confidentiality? Why is it there? Let me unpack the question a little bit. First of all, for purposes of this argument, there is not a world of difference between us and Sucre as to what is a deliverable. I'm not arguing about what's a deliverable. I'm arguing whatever a deliverable is, they included their trade secrets with those deliverables. They said, here's the code drops, and by the way, here's also our alleged trade secrets. So we don't have to argue about what's a deliverable or not. The only thing you have to concern yourself with is, was this stuff included with the deliverables? It indisputably was. What's the effect of the confidentiality provision? You know, Your Honor, I actually like Judge Brooks' analysis on that particular point. You know, he considered that there's this wide door through which information is flowing from Sucre to Walmart, and there are all kinds of contractual protections within the contract for Walmart with respect to that. But there's a narrow keyhole in the confidentiality clause by which Sucre might be able to assert a trade secret claim. And what is that keyhole? Well, in my mind, Your Honor, anything that Sucre was delivering as part of this deal and anything it was delivering collaterally, like in Section 3C, that stuff was licensed. But it's certainly conceivable to think of confidential information that was outside the scope of the deliverables, outside the scope of things that were delivered with the deliverables, that could be subject to that. I mean, for example, if Walmart showed up. But did Walmart consider confidential between these two parties? I'm sorry, say that again, please. What did Walmart consider confidential between these two parties? If Sucre shared its internal financials with Walmart during the course of this deal to prove, hey, we can do this contract. That's not a deliverable. It's not something that was delivered with the deliverables. If Walmart went and posted that on the Internet, Walmart would probably get in trouble under Section 4. But that's not what we're talking about here. We're talking about core work product that was delivered with the contract. And so that sort of stuff certainly falls within the Section 3. The Section 4 is kind of a catch-all for that small stub of things, that keyhole of information that might not qualify under the contract as a deliverable or something provided with a deliverable for which the parties might want some confidentiality protections. But let me talk about the identification requirement from the Tyson case, which I think the panel spent quite a bit of time on. I should note at the outset, I do not think the facts on this issue are actually disputed. I mean, the district court found that Sucre had failed to identify as trade secrets to Walmart three of the four trade secrets. And in Sucre's briefing, it does not say a word to take issue with what the district court concluded. Not a word. It never argues that point. The district court had a different opinion as to the fourth trade secret, the source files. In our briefing, we said that was wrong, and we showed why it was wrong. And again, Sucre doesn't say a word about that. In Sucre's arguments about the Tyson identification requirement, it never once argues, at least in its briefing, that it actually satisfied the Tyson test factually. Instead, its argument is singular, and that is that there isn't a Tyson test in the first place. That Tyson doesn't require you to identify trade secrets. That is Sucre's argument. So it basically comes down to the argument that when the Tyson court said there was an identification requirement, the Tyson court didn't mean what it said. Nevertheless, we disagree with that. The Tyson court couldn't have been clearer in rejecting this trade secret over something called a nutrient profile when it said it was incumbent upon Tyson to clearly identify what information it considered to be a trade secret. That is an identification requirement. And Sucre's briefing suggests, oh, that was dicta. It wasn't really part of the court's opinion. But if you read the court's trade secret discussion in the Tyson opinion, I mean, the very first paragraph says, how are we going to resolve this issue? We are going to consider what steps did Tyson take, both during Mr. Pertle's employment and his post-employment, to identify the nutrient profiles as trade secrets and to protect them, to identify them. And then the Tyson opinion spends page after page after page going through Tyson's efforts actually to identify those things as trade secrets and finding them lacking. So it certainly wasn't dicta in the Tyson opinion. It was core and central to the Tyson opinions, to the case of the Tyson. So Sucre's other argument with respect to the Tyson identification requirement is, well, you know, in the Tyson case, there was no written confidentiality agreement. So therefore, our case is different because we had a written confidentiality agreement. Therefore, the Tyson identification requirement doesn't apply to us. Tyson doesn't actually turn on the absence of a written confidentiality agreement. But that's besides the point. Please do look at the party's contract. Please do embrace the party's contract on this identification requirement. Because as I've mentioned, the party's contract goes out of its way to bar potential trade secret claims against Walmart. It goes out of its way to protect Walmart from trade secret and from misappropriation claims. So because of that, it was even more incumbent upon Sucre to tell Walmart, hey, even though this contract licenses basically everything we tell you, these other things we're about to provide to you, those are trade secrets, so watch out for them. They didn't do that. There's not any evidence in the record whatsoever that Sucre ever did so identify those particular techniques as trade secrets. And given the party's contractual relationship. And you're saying Tyson is the law that would require that? Absolutely. The case authority that would require that they specifically identify the secret material. Arkansas Supreme Court opinion, Your Honor. Sorry. Go ahead and finish. No, I'm done, Your Honor. Does it make any difference that this jury's made a finding that the misappropriation was willful and malicious and that the argument of Sucre is essentially that source codes at least and other data likely was produced under duress and that given it was produced under duress over repetitive objections that you had noticed that that, that Walmart had noticed that that information was in fact a secret entitled to protection? The fact that the parties were having a dispute over the contract and over what was owed under the contract isn't any evidence that Sucre told Walmart, hey, this stuff is a trade secret. People can have disputes over contracts and over things all the time without elevating them to the level of trade secrets. If I go to the restaurant today and I have a great dinner and at the end of my dinner I say, you know what, please give me the china and the silverware too because I feel like I've earned it. The restaurant will say, no, you don't get the silverware and the china. That's not part of the deal. We're having an argument over our contract, over our agreement to have dinner there. That doesn't transform the silverware and the china into a trade secret. It's still an argument over whether something was owed under the contract or not. And in that regard, I will direct you to the Tyson opinion because the Tyson opinion found that the gentleman who had taken the trade secrets actually thought they were confidential. He thought subjectively, you know what, this stuff I'm taking, it's not public. But the Tyson court nevertheless found that Tyson had not taken sufficient efforts to actually identify to the gentleman that those things were trade secrets. In other words, it's not what Walmart thinks. Even if one could say Walmart had an appreciation of this stuff as confidential. It's not what Walmart thinks. Is there evidence here that Sucre's employees that caved to the pressure were under the impression that this was not trade secrets? I have no evidence that they were under the impression this was not trade secrets. There's also no evidence that they were under the impression they were trade secrets. I mean, never once was there some memo written in between the people in the company saying, here are our great trade secrets or something like that. There's no written correspondence between the parties saying this stuff is trade secrets. There's a complete absence of evidence in the record as to that particular point, which is important under Tyson because Tyson doesn't say everything is a trade secret by default. Tyson actually puts the burden on the plaintiff to affirmatively take steps to identify something as a trade secret. That's an affirmative burden. It doesn't matter what Walmart thinks in its head. At least it doesn't matter that it thinks something is confidential or not. There has to be a communication that this rises to some level of trade secret status or protection. That's expressly what the Tyson court held. And again, in this particular instance, it's all the more important that Sucre have identified these things as trade secrets, given the fact that the contract licenses nearly everything under the sun to Walmart. Given that the contract does that, if Sucre wanted to slip this particular trade secret case through that narrow keyhole of the contract, it should have told Walmart these are trade secrets and protected them like Tyson requires. In my limited time remaining, I would like to talk about some of the other claims in the case, the contract claim and the unjust enrichment claim. With respect to the contract claim, it's a pretty simple case. The contract called for Walmart to pay Sucre $577,000. Walmart paid them $520,000. That remaining $57,000 was associated with certain deliverables under the contract, which Sucre did not provide or did not timely provide. So Walmart didn't pay the last $57,000. It's as simple as that, Your Honors. If Sucre didn't deliver what was called for by the contract, then Sucre ought not to be entitled to the payment that is provided under the contract for those deliverables. And let me talk about Sucre's two failings in that regard. First of all, half the things that Sucre had to deliver with respect to that $57,000 were 30 days of post-launch support for the website, a testing report, and a separate series of documents called Issue Resolution and Testing Report Summaries. Zero evidence in the record Sucre provided any of that. Those are all express deliverables under the contract, and there's not a whit of evidence in the record Sucre provided those things. By definition, therefore, those deliveries weren't made. The second thing that was called for by the contract was for Sucre to make a code drop by May 23rd, and it had to use its best possible efforts to do that. The evidence is undisputed in the record that as of June 2nd, at the latest June 9th, that code was done. All Sucre had to do was hit a button, and it would have transmitted that code to Walmart. But instead, Sucre sat on that code and did absolutely nothing with it for the next five weeks until July 17th. So we don't need to argue about whether or not the work that Sucre was doing on that code was its best possible work. We don't need to argue about whether it was trying hard or not, because the evidence is undisputed that from about June 9th to July 17th, Sucre was making no efforts whatsoever to meet the deadlines that had already passed. So as a matter of law, by definition, providing no efforts to meet a deadline can't possibly be providing your best possible efforts. So everything that was associated with that $57,000 payment, everything, Sucre failed to deliver either in its entirety or in a timely basis as required by the contract. I focus on this particular claim. It might sound, why did you waste five minutes of your argument on a $57,000 claim, actually a $30,000 claim? Well, Sucre was awarded $30,000 on this breach of contract claim and $1.6 million in attorney fees on this particular claim. So although the size of the claim is very small, it actually generated about half of the monetary judgment that Sucre received in this case. The other claim I want to talk about is the unjust enrichment claim. And there is no dispute between the parties that the law in Arkansas is, if you've got a written contract, generally that bars an unjust enrichment claim. There is an exception that the court found applicable here. Yes, Your Honor. There's an exception in a case called QHG. And our position is that's a narrow exception, and what Sucre is attempting to do via this appeal is take it so broad that essentially it would swallow the rule above it. So let's talk about the QHG case just briefly. In the QHG case, you had a doctor who had a contract with a hospital to be on call. That contract said, you don't have to be on call all the time. We're going to rotate other doctors in and out. As it turns out, the hospital didn't comply with that, and it made the doctor go on call 24-7. The doctor had no choice but to work 24-7, both because he was ethically bound to treat sick patients. Well, Sucre's position is that Walmart compelled him in this relationship. But there was a written contract, Your Honor, with the written procedures for how to change the scope of the contract if he wanted to change the scope of the contract. So first of all, the business pressure that Walmart was applying to Sucre, if Sucre didn't provide these web development services, no one was going to die. There was no risk of life or limb, which literally was the risk in QHG. And second of all, in QHG, the doctor couldn't not perform the contract because the contract was completely vague about how he could demand that his hours be reduced, how he could resolve the dispute over the hours. That's not the problem in this contract, Your Honor. This contract has a written procedure for changing the scope of the contract. You get a project change request. Everyone gets together, and they agree in writing to that. What Sucre is attempting to do is expand the scope of this QHG exception such that in any contractual dispute where you've got a big company on one side and a small company on the other, if the small company feels commercial pressure because it's worried about its finances, then it can essentially overperform at will and demand unjust enrichment compensation for that overperformance just because it was feeling financial pressure. I mean, I do not doubt Sucre's sincerity when it says it needed the money, it was under financial pressure, so on and so forth. But nearly every party in every contract could make that claim and say we're under financial pressure. That's not what the QHG case was about. In the QHG case, we had a doctor who had no choice but to perform, or his patients would die. That's of a different kind. And on top of that, the fact that the QHG case had no written contract that would allow changes to its scope. So in conclusion, Your Honor, as I mentioned at the beginning, we ask that the court affirm the district court's rejection of the three trade secrets and further reverse the district court as to the fourth trade secret and the breach of contract and unjust enrichment claims. Thank you. Thank you, Mr. Greenstein. Mr. Magnuson, your rebuttal. Thank you, Your Honor. I don't get to give many jury arguments, but this is a j-mal. This is rejecting a jury verdict. And for counsel to say my client overperformed at will is, frankly, on this record, outrageous. The jury heard evidence that Walmart, from the beginning, started saying, yeah, I know what the contract says, but we want more. We want more, and we want more, and we're going to destroy you if you don't give it to us. Yes, there was a provision in the contract on how you change things. Walmart wouldn't agree to it. They said, yeah, yeah, yeah, we'll get around to that, but you better give us the extra stuff or we're going to destroy you. It is outrageous to say that my client overperformed at will. A license for the deliverables. Again, according to Walmart, the license is literally a license to steal. It's a license to say, well, I know we signed up for you to give us these 13 things, and if you look at Schedule K of the contract, or you look at the district court's order at appendix page 793, he explains, there were 13 things they were supposed to provide. That's what was the deliverable. And what my colleague has done is what they did in their brief. They said a deliverable is anything that's delivered. Absolutely wrong. A deliverable is what we promised to give you. That's what they have the license to use. That doesn't include our trade secrets. The fact that the trade secrets finally were bundled into the delivery of the code that we promised to provide doesn't make them a deliverable. You asked, Your Honor, about whether the employee who finally caved in knew that these were trade secrets. Nikolai Bear was his name. Yes, he did. And if you look at the record, we lay this out in our brief, Adel Adela and Aaron Sucre, the top two guys in the company, repeatedly told Walmart, we're not giving you this stuff. Now, this stuff is the trade secrets. There's no question what they were asking for. They were demanding the tools so that they could upscale. And they were repeatedly told no. The evidence is they went around the management, and they went to Nikolai Bear, who's a very good computer programmer, but he's not a manager of the company. And they said, we have to have this or you guys aren't going to get paid. And Nikolai Bear isn't going to be able to feed his family. That's the evidence in the case. And he's the one that said, okay, I give up. Here they are. If you can have a contract that says, I can extort performance outside of the contract from you, and that's what the trade secrets were, and that's what the extra templates were. It's completely outside of the contract. I can extort that from you, but you can't sue me for that, because I've got a contract that says you can't. This was not performance pursuant to the contract. This was performance pursuant to extortion. And the jury saw that. And you have to disregard all of the evidence in the record. You have to take my colleague's sanitized, legalistic explanation of how Walmart saw this contract was set up, and ignore what the jury did in order to sustain the result here. Now, I think that I've covered the contract. I think I've covered unjust enrichment. I just want to talk a little bit about, Judge Beam, the case that you wrote was Klein, and it had to do with whether you can have an unjust enrichment claim in the face of an existing contract. And you said certainly you can. But that's not novel law. But it's a claim outside of the contract. It's not subject to the contract limitations. Counsel, before I forget to ask you, what's the effect of Zucker's bankruptcy on this case? Is there a stay? It's a Chapter 11. There was a stay granted. This appeal was put in neutral until the bankruptcy court granted permission for it to go forward because of the counterclaim by Walmart and the cross appeal. If it had just been my client's appeal, it wouldn't have been stayed, but it was. We had to wait until the bankruptcy court gave us permission to proceed, which is why this has taken so long. I want to answer my colleague's argument under Tyson. If you look at 79 Southwest 3rd, page 333, the court found that the nutrient profile was, in fact, a trade secret. It was identified as a trade secret. The reason for the result in Tyson was that Tyson didn't do anything really to protect it. Yeah, they said it was confidential, but they didn't have the same kinds of protections my client had. If you want cases that instruct you on how Arkansas law treats identification of a trade secret, you look at Sephora and Cardinal Freight. And there, the statement that we have a method of how we do things that is a trade secret. We don't tell anybody. It has value, and we keep it secret. That's enough to identify a trade secret. What did Walmart know? It knew that it didn't have it. It knew that it wasn't going to get any of these source files, the trade secrets, under the contract. It knew they had value because they had said, give us the trade secrets so we can use them to upscale our less expensive vendors. And they knew that they weren't supposed to have it. They knew they weren't supposed to have it. There are internal emails where Walmart employees are saying, it's inappropriate for us to ask this. Keep it confidential. We'll have to go around somebody to get it. Keep this just between us. That's in the record. And Nikolai Baer, when they couldn't get it from Adel Adela or Aaron Suker, they went around him. That's misappropriation. Members of the court, this is a fact-intensive case. And in Arkansas, fact-intensive trade secret cases are best left to the fact-finder. The jury heard all of this evidence, and they had no problem whatsoever in concluding that Walmart willfully and maliciously, intentionally, from the beginning, decided it was going to misappropriate my client's know-how, the trade secrets, not to get the contract done, but to move beyond the contract and to use that expertise to get a faster, cheaper result. The proper application of the J-Mall standard requires this court, respectfully, to direct Judge Brooks to reinstate the verdict and to, I'm sorry, to reinstate the first judgment and to reconsider the attorney's fee award, which he cut back dramatically in light of his chopping down of the judgment. Members of the court, if you have any further questions, I'll answer them. You've been very attentive today in a complex case. I see none. Thank you, Mr. Magnus. Thank you. The court thanks both counsel for the argument you provided to the court this morning and the briefing which you have submitted. We will wrestle with the issues as best we can and render a decision in due course. Thank you.